IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | 10 Cr. 1180 (RPP) |
| v. | The Hon. Robert P. Patterson |
| MICHAEL JACKSON, | |
| Defendant. | |

# Defendant's Sentencing Memorandum

> As a friend, he has always prided himself in being loyal, non judgmental, and supportive. There is nothing that I would not trust to confide in him, nor would I ever have any hesitation in reaching out to him if I was in need. He is a selfless human being who would give his last cent to help a friend in need.[1]

Mr. Jackson is a talented musician and loving father who has nurtured, supported, and inspired scores of people. As attested to by the fifty-five people who have submitted letters of support, Mr. Jackson is a devoted father, friend, family member, mentor, and colleague. Mr. Jackson's participation in the robbery represents an aberration in Mr. Jackson's life and should be considered in the context of who Mr. Jackson is and what he has done to uplift others.

Mr. Jackson has not led a perfect life. Raised in South Central Los Angeles, Mr. Jackson grew up in a fractured home, his mother effectively abandoning him and his family to travel the country as an evangelical Christian minister. As a teenager, Mr. Jackson turned to a street gang for camaraderie; his gang membership and burgeoning drug use went hand in hand with his participation in several petty crimes.

[1] Letter of Julana Torres, attached as Exhibit 51. All excerpts from the exhibits are quoted verbatim.

As an adult, Mr. Jackson has made sincere efforts to transcend the loss and pain that he has suffered. He quit the gang, stopped smoking marijuana, mourned the deaths of his mother and father, worked diligently to build a career as a musician, taught teenagers to express themselves through rap without degrading others, and has done his best to be a good father for his young children.

Mr. Jackson knows that he made a tremendously poor and dangerous decision to get involved in this robbery. Mr. Jackson acutely regrets his actions, which have caused and will continue to cause pain to the store clerk, himself, and his family, especially his children, for years to come.

Despite his failings, Mr. Jackson is a compassionate and caring human being who has touched the lives of those fortunate enough to know him. He is exactly the type of person who should receive a sentence that is sufficient but not greater than necessary to meet the ends of sentencing. It is respectfully suggested that a sentence as close as possible to 60 months' imprisonment would be a reasonable and appropriate sentence in light of all of the factors outlined in 18 U.S.C. § 3553.

**1. Procedural Background**

On November 5, 2010 federal authorities arrested Mr. Jackson in New York City on the instant offenses. Mr. Jackson was arraigned in the Southern District of New York on the same day on a three-count Complaint charging conspiracy to commit armed robbery in violation of 18 U.S.C. § 1951, committing armed robbery in violation of 18 U.S.C. § 1951, and use of a firearm in violation of 18 U.S.C. § 924(c). The government arrested and charged co-defendant Akil Nesbitt with similar counts.

Nesbitt pleaded guilty to all three counts, which were contained in a Superseding

Information. On August 24, 2011 the Court sentenced Nesbitt to one month of imprisonment on Counts One and Two to be followed by 60 months of imprisonment on Count Three. On January 5, 2012 Mr. Jackson entered a plea of guilty to a Superseding Information containing the same three counts as Nesbitt and now stands before the Court for sentencing.

**A. The Plea Agreement**

Well in advance of trial, Mr. Jackson, through counsel, notified the government that he did not want a trial but instead wanted to accept responsibility and enter a plea of guilty. A formal plea agreement between Mr. Jackson and the government was negotiated and a copy has been provided to the Court and the Probation Office.

Mr. Jackson agrees with the calculation of the Guidelines range as set forth in the plea agreement and in the Presentence Investigation Report ("PSR"): a total offense level of 19 and a criminal history level of II. Thus, the Guidelines range is 33-41 months for Counts One and Two, with a mandatory minimum consecutive term of 60 months' imprisonment for Count Three, resulting in a stipulated Guidelines range of 93 to 101 months' imprisonment. While Mr. Jackson agrees that any sentence within that stipulated Guidelines range would be reasonable under 18 U.S.C. § 3553 and United States v. Booker[2] and its progeny, Mr. Jackson, as detailed below, urges the Court to consider a sentence below the stipulated Guidelines range.

**B. The Probation Office's Sentencing Recommendation**

The Probation Office has made a sentencing recommendation to the Court that falls within the parameters set forth in the plea agreement. Specifically, the Probation Office has recommended a sentence of 93 months (33 months on Counts One and Two,

[2] 543 U.S. 220 (2005).

concurrent with each other, followed by a mandatory and consecutive term of 60 months on Count Three).[3] In addition, the Probation Office has recommended that no fine be imposed in light of Mr. Jackson's inability to pay.[4]

**2. Sentencing Post-*Booker***

Under Booker and its progeny, including United States v. Crosby[5] and United States v. Cavera,[6] the Sentencing Guidelines, while no longer mandatory, are advisory and should be "taken into account" in determining the appropriate sentence under 18 U.S.C. § 3553(a).[7] "The Guidelines provide the 'starting point and the initial benchmark' for sentencing, and district courts must 'remain cognizant of them throughout the sentencing process.'"[8]

The Second Circuit has cautioned that "[e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the §3553(a) sentencing factors."[9] When considering whether to impose a sentence outside of the recommended Guidelines range, a district court "'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance,'" in order to reach "an informed and individualized judgment in each case as to what is 'sufficient, but not greater than necessary' to fulfill the purposes

---

[3] PSR at 32.
[4] Id.
[5] 397 F.3d 103 (2d Cir. 2005).
[6] 550 F.3d 180, 187 (2d Cir. 2008) (en banc).
[7] Booker, 543 U.S. at 264.
[8] Cavera, 550 F.3d at 189 (quoting Gall v. United States, 128 S. Ct. 586, 596 & n.6 (2007)).
[9] United States v. Dorvee, 616 F.3d 174, 182 (2d Cir. 2010); see Cavera, 550 F.3d at 189 (emphasizing that "a district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense").

of sentencing."[10]

In determining an appropriate sentence, a district court must adhere to § 3553(a), which directs that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Such a sentence must be fashioned:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.[11]

In the final analysis, the district court must consider all the factors outlined 18 § 3553(a):

- the nature and circumstances of the offense and the history and characteristics of the defendant;
- the four legitimate purposes of sentencing;
- the kinds of sentences available;
- the Guidelines range itself;
- any relevant policy statement by the Sentencing Commission;
- the need to avoid unwarranted sentence disparities among defendants; and
- the need to provide restitution to any victims.

---

[10] Cavera, 550 F.3d at 189 (quoting Gall, 128 S. Ct. at 597 and 18 U.S.C. § 3553(a)).
[11] See 18 U.S.C. §3553(a)(2).

In Pepper v. United States,[12] the Supreme Court reiterated that the Guidelines are one of many factors to be considered by the district court and that sentencing must fit the offender and not merely the crime.

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." . . . Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime."[13]

The Pepper decision reaffirmed that a sentencing judge has "an overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)."[14] "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'"[15]

**2. Applying the § 3553(a) Factors**

Although the parties agree that a reasonable sentence is a Guidelines sentence in the range of 93-101 months, Mr. Jackson requests the Court to consider imposing a sentence below the stipulated Guidelines Range.[16] Taking into account all of the factors set forth in § 3553(a), it is respectfully suggested that a sentence as close as possible to 60

---

[12] --- U.S. ---, 131 S. Ct. 1229 (2011)
[13] Id. at 1239-40 (quoting Koon v. United States, 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) and Williams, 337 U.S., at 247, 69 S.Ct. 1079)(citing Pennsylvania ex rel. Sullivan v. Ashe, 302 U.S. 51, 55, 58 S.Ct. 59, 82 L.Ed. 43 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender")).
[14] Id. at 1242-43.
[15] Id. at 1240 (quoting Wasman v. United States, 468 U.S. 559, 564, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984)).
[16] The parties' plea agreement states that "the parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range, suggest that the Probation Department consider a sentence outside of the Stipulated Guidelines Range, and suggest that the Court *sua sponte* consider a sentence outside of the Stipulated Guidelines Range, based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a)." Plea Agreement at 4.

months' imprisonment would constitute not only a sentence "sufficient but not greater than necessary" to achieve the objectives of sentencing, but also a "reasonable" sentence under post-Booker sentencing jurisprudence.

**A. The Nature and Circumstances of the Offense and the History and Characteristics of Mr. Jackson**

***(1) The Nature and Circumstances of the Offense***[17]

On June 4, 2010 three men with covered faces robbed a grocery store clerk in the Bronx. The men, one of whom was Mr. Jackson, displayed firearms in the course of the robbery and took various items from the store clerk, who was also struck with a gun, but fortunately did not receive a significant injury. Police who happened to be across the street saw Mr. Jackson and Akil Nesbitt leave the grocery store right after the robbery, gave chase, and arrested them down the street from the grocery store. The police recovered two guns and the personal effects of the store clerk on or near Nesbitt and Mr. Jackson.

Mr. Jackson did not attempt to obstruct justice in any way, either at the time of his arrest or afterward.[18]

***(2) The History and Characteristics of Mr. Jackson***

> But out of the darkness, I came the farthest,
> Among the hardest survival.
> Learn from these streets, it can be bleak,
> Except no defeat, surrender retreat[19]

Mr. Jackson, 36, was born in wedlock in Atlanta in 1976 to Lloyd Jackson and Cynthia Love.[20] Mr. Jackson was the fifth and youngest child in the household.[21] Both

---

[17] See PSR ¶¶ 10-23.
[18] PSR ¶ 24.
[19] Lyrics from the song "Wavin' Flag" by K'naan.
[20] PSR ¶ 84.

Lloyd and Cynthia had two daughters each from prior relationships; they had one daughter together, Angela, who was four years older than Mr. Jackson, and a son, Wendell, who was two years older than Mr. Jackson.[22]

Six months after Mr. Jackson's birth, the family moved to Southern California because Lloyd got a job as an airplane mechanic at Lockheed Martin.[23] Mr. Jackson grew up in Los Angeles, living in the South Central, Compton, and Watts neighborhoods.[24] When Mr. Jackson was five years old, his parents separated.[25] His mother moved away to Savannah, Georgia, leaving Lloyd to raise Mr. Jackson and his brother and sister.[26]

Mr. Jackson's parents were fascinating people. Lloyd and Cynthia both were active in the Civil Rights Movement and actually met at a march led by Rev. Martin Luther King, Jr.[27] Lloyd was one of the first African Americans to become an Air Force mechanic.[28] He earned multiple degrees in math and political science and was an ordained minister with the AME church.[29] Lloyd held several jobs in the aeronautics field – he even worked on Stealth airplanes, a task that contributed to his death.[30] Lloyd coached track at Morehouse College; one of the notables coached by Lloyd was Edwin Moses, an iconic sprinter who won gold medals in the 1976 and 1984 Olympics in the 400 meter hurdles and set the world record four times.[31]

---

[21] PSR ¶¶ 84-87.
[22] Id.
[23] PSR ¶¶ 91-92.
[24] See PSR ¶ 92-93.
[25] PSR ¶ 88.
[26] See PSR ¶¶ 88-89.
[27] See PSR ¶ 90.
[28] PSR ¶ 90.
[29] PSR ¶ 90.
[30] PSR ¶¶ 90-91.
[31] PSR ¶ 90.

Cynthia, who also had an advanced degree, devoted herself to the Christian ministry.[32] Cynthia separated from Lloyd because she felt that she had been called to join the ministry full-time with evangelist faith healer Minister Benny Hinn.[33] Although she moved from California to Georgia, Cynthia stayed in touch in Mr. Jackson, speaking to him on the phone every other day and visiting him at least twice a year.[34]

Mr. Jackson remembers how difficult things became after his parents separated. Lockheed laid-off Lloyd, making money very tight. Mr. Jackson recalls his family living in friends' apartments and even in cars because Lloyd could not afford to pay rent, losing the roof above their heads.[35] Financially, things improved over time as Lloyd secured employment in the aeronautics field again, however the experience of being homeless made an indelible impression on Mr. Jackson.

In 1992, when Mr. Jackson was 16 years old, his mother planned to travel from Savannah to Atlanta to preach at a church. While driving to Atlanta, a drunk driver smashed head-on into Cynthia's car, killing her.[36] Although Mr. Jackson lived across the country from his mother, he considered their relationship to be very close. Cynthia's untimely death crushed Mr. Jackson.

Twelve years later in 2004 Mr. Jackson's father passed away after suffering from prolonged illnesses that likely stemmed from his work constructing Stealth planes.[37] Mr. Jackson took care of his father during his illness. With Lloyd's passing, Mr. Jackson lost both his father and his most influential role model.

---

[32] See PSR ¶ 88.
[33] PSR ¶ 88.
[34] PSR ¶ 88.
[35] See, e.g., PSR ¶ 88.
[36] PSR ¶ 91.
[37] PSR ¶ 91.

As a teenager, Mr. Jackson succumbed to peer pressure and gravitated towards a local street gang, eventually joining it.[38] He began smoking marijuana when he was 11and by 14 was smoking daily.[39] Mr. Jackson also committed crimes that resulted in his arrest and conviction.[40]

Even though Mr. Jackson was involved in delinquent behavior, he still went to school, a testament to the influence of his father who tried to keep the negative influences in Mr. Jackson's life at bay. Mr. Jackson's father transferred Mr. Jackson out of Los Alamitos High School where white skin heads regularly picked fights with Mr. Jackson.[41] In 1994, Mr. Jackson graduated from David Starr Jordan High School in Los Angeles.[42] Mr. Jackson had plans to attend Morehouse College on a scholarship, however his SAT scores did not pass muster.[43] Lloyd decided to move the family to Portland, Oregon to escape the negative conditions that existed in their neighborhood in Los Angeles, a neighborhood where young man routinely died in drive-by shootings and other acts of violence.[44] In the fall of 1994, Mr. Jackson enrolled in Portland Community College and attended for 18 months.[45] Mr. Jackson went back to school in 2009 to study jazz music theory at Mount Hood Community College.[46]

The move to Portland after high school proved to be a pivotal point in Mr. Jackson's life. Starting at ten years old, Mr. Jackson displayed impressive musical talent, particularly in singing. At age 13, Mr. Jackson participated in musical shows at the local

---

[38] PSR ¶¶ 93, 107.
[39] PSR ¶ 112.
[40] PSR ¶¶ 39-82.
[41] PSR ¶ 117.
[42] PSR ¶¶ 116-117.
[43] PSR ¶ 115.
[44] PSR ¶¶ 92-94, 117.
[45] PSR ¶ 115.
[46] PSR ¶ 114.

skating rink. Upon moving to Portland, Mr. Jackson threw himself into music, making connections with other musicians, artists, and producers. In 2000, Mr. Jackson signed a record deal with BSI records.

Mr. Jackson, who performs under the name "Libretto," writes and performs positive Hip Hop music, eschewing cursing and derogatory language. He has performed and toured with the group "Lifesavas." In 2003 Mr. Jackson signed a record deal with Dim Mak records. His discography includes two singles released in 2001, a single released in 2004, and an album released in 2004 entitled "Ill-oet: The Last Element." Mr. Jackson recently worked on songs to be included in a Gospel album. Mr. Jackson has also written and performed songs for the Law & Order television series. A more detailed overview of his music can be gleaned from Mr. Jackson's website: www.slumfunk.com.

Besides making music, Mr. Jackson teaches music to kids in the community. From 2002 to 2009, Mr. Jackson worked at Self Enhancement, Inc. ("SEI") in Portland, where he taught the history of Black music, from Jazz to Hip Hop.[47] His long-term dream is to return to Mt. Hood Community College, where he took music theory classes, and earn a bachelor's degree in music theory and then create a non-profit community center to teach kids in the inner city how to read and write music.

Mr. Jackson has two children, a 12 year-old girl and a 2 year-old boy.[48] His oldest, [NAME REDACTED], was born with glaucoma.[49] By age three, [NAME REDACTED] had undergone three laser eye surgeries.[50] While her doctors hoped the glaucoma would recede by age ten, that has not happened. Mr. Jackson's daughter is

---

[47] PSR ¶ 121.
[48] PSR ¶¶ 95, 99.
[49] PSR ¶ 98.
[50] PSR ¶ 98.

blind in one eye and every day must take special eye drops. [NAME REDACTED] lives with her mother Sharesa Isom in Portland.[51] Mr. Jackson and Sharesa had been a relationship for five years before [NAME REDACTED] was born.

Mr. Jackson's son lives in Portland with Alice Price.[52] Alice and Mr. Jackson were together about seven years before [NAME REDACTED] was born. Mr. Jackson is an active and involved father. He talks to his children at least every other day, frequently communicating via video chat. Mr. Jackson also provides financial support for his children as best he can, though he does have outstanding child support to pay.[53]

Besides the medical hardship faced by his daughter, Mr. Jackson has serious health concerns of his own. Mr. Jackson suffers from kidney failure that likely is caused by his chronic high blood pressure.[54] His doctors inform him that his kidneys function at about 60% of what they should.[55] Although he does not receive dialysis treatments, Mr. Jackson must take benazepril every day to control his blood pressure and to prevent any further damage to his kidneys.[56]

Mr. Jackson's father Lloyd also suffered from kidney failure.[57] Evidently either fiberglass or some other toxic material got into Lloyd's hip when he helped build Stealth airplanes, which led his doctor to prescribe him certain medication.[58] It is Mr. Jackson's understanding that the prescribed medication caused Lloyd to have renal failure.[59] After

---

[51] PSR ¶ 95.
[52] PSR ¶ 99.
[53] PSR ¶¶ 98-99.
[54] PSR ¶ 109.
[55] PSR ¶ 109.
[56] PSR ¶ 109.
[57] PSR ¶ 91.
[58] PSR ¶ 91.
[59] PSR ¶ 91.

unsuccessfully being on dialysis, Lloyd passed away in 2004.[60] Mr. Jackson was simply devastated by losing his father, the man who had raised him and instilled so many important life lessons.

Despite facing numerous personal hardships, Mr. Jackson exudes a positive attitude that is strongly corroborated by the fifty-five people who have submitted letters of support on behalf of Mr. Jackson. These letters, written by people from all walks of life, demonstrate that Mr. Jackson is a warm, caring human being who takes the time to help others.

One of Mr. Jackson's former mentees from SEI, Emanuel Ford, currently attends Morehouse College and writes the following:

> Libretto stressed the value of positivity in music. Any profanity or inappropriate language and concepts weren't tolerated in our music. He tried to guide us to use more of a positive approach to our music and make it appropriate for people of all ages to listen to. Not only did he show us the right approaches but he also exemplified positive concepts in his own music as well. Libretto was an underground artist and a well known name in the Portland underground music scene. He also critiqued our music in the Studio Production class. He taught us different recording techniques to use during the recording process. These skills I still use till this day when I record. Libretto instilled the values of focus and passion for our music and to use or talents to change lives instead of following the typical recording artist in the music industry today.
>
> Libretto is a good positive role model and mentor and is never known for anything negative or harmful. I've known him for years and violence is not in his character. He encourages everyone to be the best they can be. I am hopeful that this letter will convince those who think otherwise.[61]

Another former mentee from SEI, Gary Bradley, writes the following:

> In high school i had the pleasure of workin with libretto in the

[60] PSR ¶ 91.
[61] Exhibit 12.

> music studio class at Self Enhancement Inc. He taught the students to write an make positive music. Libretto showed kids how to take past problems an everyday life struggles an put it into a form of art. Expressing one's self through music or poetry. Libretto only asked for a few things from the kids one being that we would not curse in our songs or talk about anything negative. Micheal also made it a challenge for the students to talk about any an everything that happened in our lives, for that if u could write about what you been through people will respect your music. Libretto has always been a positive role model to me an my friends always showed love an support to everything we did. When we made mistakes he helped us correct them an learn from them. Libretto has help me more then a lot of people could have only because he could relate to the me an things that i was going through. I thank an appreciate everything he has done for me an i pray that everything works out for him in the future. We all make mistakes an we all should have a chance to learn from them an help others not travel down the negative road. They say the best teacher of wisdom is the one who has experienced life trials an tribulations an teaches the ones under him because of the love he has for not only them but himself. Reach one,Teach one.[62]

Richard Hunter, Jr. writes that because of Mr. Jackson's dedicated work with young children and teenagers for eight consecutive years at SEI, "I was influenced to do the same and I have been working with young and underprivileged teenagers as a counselor with the Salvation Army for 6 years."[63]

Christopher Holloway echoes Mr. Jackson's willingness to help others:

> I first met Michael the summer of 2003. I was fresh out of college, I had a baby on the way, and I had developed a problem with alcohol. Michael was introduced to me by my sister in hopes that he could help me see the error of my ways and help me become a better man before my child arrived. Michael's friendship brought me away from the bottle and closer to our Lord Savior. He helped me to realize and come to terms with my drinking problem and the stress that caused it. For this I will forever be indebted to Michael because not only did he save my life but he saved my son the anguish of growing up with an alcoholic Father.

[62] Exhibit 5.
[63] Exhibit 20.

> Additionally, over the years I've witnessed Michael mentor the lives of others through his work with the youth in various community programs like teaching a music class for at risk youth and fitness and spiritual awareness programs that he's introduced or been apart of in the community. Also, Michael has utilized his musical talent via his stage name "Libretto" to promote non-violence, education, and positivity. He's used his influence as a hip hop artist as an extension of his positive mentoring nature and spiritual passion.[64]

Tiffanie Johnson describes Mr. Jackson as follows:

> I have known Mr. Jackson for many years now as a close friend. . . . In all the many years of knowing him he has always been a great father and a wonderful friend. Having lost his parents, I was always amazed at his ability to still find his own way and to stay a positive spirit. He always expressed his passions for his work with the children in the after-school program and smiled whenever he was telling a story about "his kids" . . . . He is a dear friend of mine, he always encouraged me to stay in school and stay positive and I have. In fact his encouragement has empowered me to complete my college education and look into the future as an opportunity to grow.[65]

Terrence Scott, from Executive Branch Management, writes the following:

> I have known Michael Jackson for over 10 years now as a personal and business associate.
>
> Michael has been instrumental in the growth and development of the Pacific Northwest's music scene. Michael pka Libretto has toured the country, as well as the region and been a shining light of inspiration for artists aspiring to achieve success in the music industry.[66]

Chris Funk, the lead guitarist for the musical group The Decemberists, who had the number one selling album in the United States in January of 2011, states the following:

> I met Mr. Jackson over 10 years ago in Portland, OR. Portland is a community known for it's music and it's people. While I consider

[64] Exhibit 18.
[65] Exhibit 26.
[66] Exhibit 44.

> Mr. Jackson a friend and peer, he is in his own right an active part, an attribute, and crutial member to our pool of talent, while at the same time giving back to our community. Mr. Jackson has fostered younger members and at risk youth through his music while working at SEI. He's is an amazing father as well.[67]

As can be gleaned from the letters of support, Mr. Jackson has compelling personal attributes that should be considered in fashioning a sentence sufficient but not greater than necessary to meet the goals of sentencing.

**B. A Sentence Below the Guidelines Range Will Adequately and Reasonably Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

A sentence below the stipulated Guidelines Range will reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

Such a sentence would send a strong message that participation in a robbery is a serious offense, yet provides some leniency for the unique circumstances of Mr. Jackson, thus providing a just punishment tailored for the offense and defendant.

**C. A Sentence Below the Guidelines Range Will Afford Adequate Deterrence to Criminal Conduct and Will Adequately and Reasonably Protect the Public from Further Crimes of Mr. Jackson**

A sentence below the stipulated Guidelines Range will provide more than adequate specific and general deterrence considering the facts before the Court. Mr. Jackson will not be able to commit crimes against the general public while he is incarcerated.

Upon release, Mr. Jackson will not forget the lessons of federal incarceration. Mr. Jackson' strong feelings of remorse and positive steps towards rehabilitation already have been demonstrated by his decision to accept responsibility and to try to get his financial affairs in order to help support his children during his incarceration.

---

[67] Exhibit 13.

In sum, the requested sentence would send a strong signal that the criminal conduct for which Mr. Jackson has been convicted is not worth the risk.

**D. The Court Should Decline to Impose a Fine**

Taking into consideration Mr. Jackson's indigency[68] and the recommendation of the Probation Office[69] it is respectfully requested that the Court decline to impose a fine.

**E. Restitution Should be Joint and Several**

The Probation Office did not recommend that restitution be ordered.[70] If the Court finds that restitution is warranted, such restitution should be apportioned jointly and severally. Also, it is requested that the Court waive the requirement of interest pursuant to 18 U.S.C. § 3612(f) (3) on the ground that Mr. Jackson does not have the ability to pay interest. Without this waiver, interest begins to accrue fifteen days after judgment and is compounded daily. This would be a financial burden on Mr. Jackson and his family. Additionally, it is respectfully requested that the Court stay the payment of any financial penalties until thirty days after Mr. Jackson's release from custody.

**F. Mr. Jackson Should Be Incarcerated Near Portland, Oregon**

To maintain healthy ties with his family and loved ones, particularly with his children who live in Portland, it is respectfully requested that the Court recommend that the Bureau of Prisons incarcerate Mr. Jackson as close to Portland, Oregon as possible.

[68] PSR ¶¶ 124-126.
[69] PSR at 32.
[70] PSR at 32.

**Conclusion**

> Michael has been a role model in his community for several years effecting change in the minds of young people all around him. In my own life, as a single mother, Michael has been able to help mold my children's thoughts and be role model for them growing up taking the place the male figure in their lives they were lacking. As a result, I have two strong men I am proud of in the choices they make everyday.
>
> We all make wrong decisions in life from time to time. My plea and prayer is that you will see Michael not in the light of many of the unruly characters depicted in the headlines today, but as a person of good character who has made many changes in his mind and his life as well as the minds of others for the better.[71]

Because of the unique history and circumstances of Mr. Jackson as well as the other goals of sentencing, it is respectfully requested that the Court impose a reasonable sentence that falls below the stipulated Guidelines Range and that is as close to the mandatory minimum sentence as possible.

Dated: March 9, 2012

Respectfully submitted,

_____/S/____________________

SEAN M. MAHER
SM 7568
*Counsel for the Defendant*
The Law Offices of Sean M. Maher, PLLC
233 Broadway, Suite 801
New York, NY 10279
(212) 661-5333
(212) 227-5808 fax

[71] Exhibit 22, Letter of Angela Jackson, sister of Mr. Jackson.